**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | Criminal No. |
| WAYNE THOMPSON, ) | 08-10167-NMG |
| ) | |
| Defendant. ) | |
| _____ ) | |

**MEMORANDUM & ORDER**

GORTON, J.

The defendant in this case is charged with 1) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), 2) possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 3) possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c).  He moves to suppress evidence discovered during a search of 127 Newbury Street in Brockton, Massachusetts, asserting that the warrant pursuant to which that search was conducted was not supported by probable cause.

I.   **Factual Background**

The following facts are drawn from the affidavit of Detective Robert J. Morrissey ("Morrissey") of the Brockton Police Department, upon which the search warrant at issue was based.  Morrissey is an 11-year veteran of the Brockton Police Department and a member of the Narcotics/Vice Unit.  During the

-1-

course of his career and prior to this investigation he participated in hundreds of undercover narcotics operations and assisted the Federal Drug Enforcement Agency ("the DEA") and the Massachusetts State Police in drug investigations.

On January 15, 2008, a member of the of the Brockton Police Department asked a confidential informant ("the CI") to make a controlled purchase of cocaine from an apartment located at 106 Main Street in Brockton.  The CI contacted a person named David at that location who told the CI that he would be receiving a delivery shortly.

Upon learning that information, police set up surveillance at 106 Main Street and observed a man fitting David's description leave the building and get into the passenger seat of a blue Ford Explorer (bearing Massachusetts Registration 12RH60) that had just pulled over.  The vehicle drove off and police followed it for approximately one-quarter mile, at which point David got out and walked back towards 106 Main Street.  Based on their training and experience, together with the information provided by the CI, officers concluded that David received a delivery of cocaine from the person in the blue Explorer.

On February 7, 2008, Morrissey received a tip from the CI that a black male named Wayne was selling crack cocaine in the City of Brockton.  The CI provided Morrissey with a phone number for Wayne and stated that Wayne ordinarily delivers cocaine to

his customers in a blue Ford Explorer.  That same day Morrissey arranged to have the CI make a controlled buy from Wayne who was later identified as the defendant Wayne Thompson ("Thompson").

The CI called Thompson and arranged to meet him at a specific location in Brockton to consummate the transaction. Police conducted surveillance of that location and observed the arrival of the same blue Ford Explorer seen on January 15, 2008. The CI got into the passenger side of that vehicle, emerged about one minute later and subsequently provided detectives with crack cocaine that Thompson had purportedly sold to him.

Following that transaction, Morrissey followed the blue Explorer to 127 Newbury Street in Brockton where he observed Thompson get out of the car and enter the side door of the residence at that address.  At 7:15 PM, Morrissey observed Thompson come out from that same side door and walk directly to the driver's side door of the blue Explorer.  He opened the driver's side door, leaned in for approximately 30 seconds, closed that door and walked around the vehicle to the rear passenger side door, opened it, leaned inside for another three minutes before finally closing the door and departing from the scene on foot.

Police followed Thompson to a nearby street corner where they observed him get into the passenger seat of a waiting car and get out about one minute later.  Thompson proceeded to walk

back to 127 Newbury Street, where he again opened the rear passenger door of the blue Explorer, leaned in for 30 seconds and then re-entered the residence through the side door.

Based on his observations, training and experience, Morrissey believed that Thompson probably was storing cocaine inside an electronically activated hidden compartment (or "hide") inside the blue Explorer. Specifically, Morrissey believed that Thompson's brief visits to the driver's seat of the vehicle were for the purpose of activating the hide and that he then accessed the hide through the rear passenger door.

On February 8, 2008, Morrissey was again conducting surveillance at 127 Newbury Street when he observed the defendant come out of that residence and get into the blue Explorer. Detectives then had a uniformed officer stop Thompson in an effort to ascertain his identity and address. During the stop, Thompson told the officer that he lived at 416 North Montello Street in Brockton.

After the vehicle stop detectives followed Thompson to a liquor store parking lot. Upon arrival they observed a man lean into the driver's side window of Thompson's vehicle for about one minute and then get into a car and leave. Police continued their surveillance of Thompson and observed him drive to a house on Vine Street in Brockton, where he stayed for about one hour before returning directly to 127 Newbury Street.

-4-

Upon arriving at 127 Newbury Street, detectives observed Thompson enter the side door and climb the stairs leading up to the third floor apartment.  They observed the lights in that apartment go on, after having been completely dark, and observed Thompson in the apartment through the windows.  Upon checking with National Grid electric company, Morrissey learned that the registered subscriber for the third floor apartment was Clarence Love.

After discovering Thompson's identity, Morrissey also ran a Board of Probation check on him.  That check revealed that Thompson had 48 prior charges, 22 of which were narcotics related.  Thompson had been found guilty of six narcotics related offenses dating back to 1992, with the most recent being for distribution in 2000.

On February 11, 2008, police again conducted intermittent surveillance at 127 Newbury Street.  They observed the blue Explorer parked in front of that address at 4:30 p.m. and on three subsequent occasions, the latest being 11:30 p.m.  In his affidavit, Morrissey stated that he knew 127 Newbury Street to be Thompson's residence because he observed the blue Explorer parked there "during late night hours."

The next day, officers surveilling 127 Newbury Street saw Thompson arrive in the blue Explorer at 6:00 p.m.  When he got out of his car, Thompson walked to the rear passenger door,

leaned in for about one minute, then closed that door and went to the front passenger door.  Thompson again leaned in for about a 30 seconds before closing that door and entering the residence. Officers again watched Thompson climb the stairs and observed the lights go on in the third floor apartment after he arrived.

Officers once again surveilled the blue Explorer parked in front of 127 Newbury Street on February 13, 2008, and arranged to have the CI make a controlled buy of cocaine from Thompson on that same day.  At the direction of the police, the CI called Thompson, who agreed to make a delivery and provided the CI with a place and time for the transaction.  Police set up surveillance at that location and also maintained their surveillance at 127 Newbury Street.

Officers at Newbury Street observed Thompson leave the residence, get into the blue Explorer and drive directly to the arranged location for the transaction.  At that location police observed the CI get into the vehicle for a very short time before emerging.  They later retrieved from the CI the cocaine that Thompson had purportedly sold.  Following the transaction officers continued surveillance of Thompson, who "drove through the streets of Brockton" and eventually returned to 127 Newbury Street.

Later that evening, Morrissey was conducting surveillance at 127 Newbury Street and observed Thompson leave the residence in

-6-

the blue Explorer at approximately 10:00 p.m.  Morrissey followed Thompson to 106 Main Street, where he observed him meeting with a man known by Morrissey as "Bob."  Morrissey was familiar with Bob and had learned from the CI and others that he sold crack from the 106 Main Street location.  The CI informed Morrissey that Bob purchases cocaine from Thompson to sell to his customers. On the night of February 13, 2009, Morrissey observed Bob get into Thompson's vehicle and drive down various streets in the vicinity of 106 Main Street.  Eventually Bob got out and returned to the 106 Main Street address.

Based on all of the foregoing, a search warrant for 127 Newbury Street was issued on February 14, 2008, and executed that same day.

## II.  **Procedural History**

A criminal complaint issued against the defendant Thompson on May 1, 2008, and an indictment was handed down on June 11, 2008.  On January 15, 2009, Thompson moved for leave to file a motion to suppress (four days after the deadline set by Magistrate Judge Judith G. Dein) and simultaneously filed the pending motion to suppress.  On January 23, 2009, the government filed an assented to motion for an extension of time to respond to the motion to suppress and, on February 12, 2009, filed an opposition to that motion.

## III. **Defendant's Motion to Suppress**

### A. **Legal Standard**

A warrant application must demonstrate probable cause to believe that 1) a crime has been committed (the commission element) and 2) particular evidence of the offense will be found at the place to be searched (the nexus element). United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005). Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found at a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). A prior judicial determination of probable cause is entitled to great deference by the reviewing court. Id. In considering the sufficiency of an affidavit, a court must determine whether the "totality of the circumstances" presented demonstrate probable cause. United States v. Strother, 318 F.3d 64, 67 (1st Cir. 2003).

### B. **Application**

The defendant asserts that the warrant authorizing the search of 127 Newbury Street was not supported by probable cause and that the so-called "good faith" exception is inapplicable to that search.

#### 1. **Probable Cause**

The defendant maintains that probable cause to search 127 Newbury Street was lacking because the affidavit in support of the search warrant failed to establish a nexus between that

-8-

address and his alleged drug trafficking.  Moreover, he asserts
that there was no probable cause even to believe that 127 Newbury
Street was his residence, thus further undermining the nexus
element.

The First Circuit Court of Appeals has held that probable
cause to suspect that someone has committed a crime does not
automatically give rise to probable cause to search that person's
home.  See United States v. Feliz, 182 F.3d 82, 88 (1st Cir.
1999).  Nevertheless,

> interpreting a search warrant affidavit in the proper
> commonsense and realistic fashion may result in the
> inference of probable cause to believe that criminal
> objects are located in a particular place, such as a
> suspect's residence, to which they have not been tied
> by direct evidence.

Id. (internal quotation marks and citation omitted).  In some
circumstances the nexus between the crime and the location to be
searched

> can be inferred from the type of crime, the nature of
> the items sought, the extent of an opportunity for
> concealment and normal inferences as to where a
> criminal would hide [evidence of a crime].

Id. (alteration in original) (quoting United States v. Charest,
602 F.2d 1015, 1017 (1st Cir. 1979)).

In upholding searches of a drug suspect's residence, the
First Circuit has relied on a number of considerations including:

> 1)   the affiant's statement, drawn from his or her training
>      and experience, that drug traffickers frequently use
>      their homes for storing cash and records associated
>      with their business, see id. at 87; see also Ribeiro,
>      397 F.3d at 50-51;

-9-

2)   evidence that the suspect dealt in large amounts of money or drugs and thus required a "safe yet accessible place" to store cash and customer records, <u>Ribeiro</u>, 397 F.3d at 50; <u>Feliz</u>, 182 F.3d at 87-88;

3)   evidence that the suspect was a long-time drug trafficker, <u>Feliz</u>, 182 F.3d at 87;

4)   evidence that the suspect traveled directly from his or her residence to the location of drug transactions, <u>Ribeiro</u>, 397 F.3d at 50-51, or that the suspect worked out of the home, <u>United States</u> v. <u>Keene</u>, 341 F.3d 78, 82 (1st Cir. 2003).

Assuming for the moment that police had probable cause to believe that 127 Newbury Street was Thompson's residence (a point to which the Court will return), the Court first considers whether the affidavit, in light of the factors presented above, established a nexus between Thompson's alleged drug trafficking and that address.

### a.   Nexus with 127 Newbury Street

Many of the factors identified by the First Circuit as showing a nexus are present in this case.  First, the police possessed evidence suggesting Thompson was dealing with significant quantities of drugs and cash.  <u>See</u> <u>Feliz</u>, 182 F.3d at 88 (noting that large-scale drug traffickers require a "safe yet accessible" place to keep cash and drug related records).  Although Morrissey's affidavit did not estimate the amount of drugs or cash involved in the controlled buys, it did state that Morrissey received information from the CI that Thompson sold drugs to a dealer named Bob who in turn sold drugs to his

customers.  It is reasonable to infer from such transactions that
Thompson was dealing with substantial quantities of drugs and
cash that would need a secure place for storage.  See id. 87-88.
Thompson's lengthy criminal history of narcotics offenses also
suggests that his trafficking was a long-term enterprise, likely
to involve numerous customers and substantial records.  See id.
(noting that "it could reasonably be supposed that a regular
trafficker . . . possessed documents showing the names and
telephone numbers of customers and suppliers as well as accounts
showing the monies paid and collected").

Although the defendant avers that police observations
pointed only to the blue Explorer as a location where drugs were
being stored, Morrissey's affidavit reveals several direct links
between Thompson's drug trafficking and 127 Newbury Street.
Specifically, on two occasions police observed Thompson leave
that residence and proceeded directly to locations where drug
transactions took place (without first opening the rear passenger
door presumably to access a hide).  The clear inference is that,
on those occasions, Thompson already had drugs with him when he
left 127 Newbury Street and thus he did not need to access the
hide in his vehicle before making the sale.  See Ribeiro, 397
F.3d at 50-51 (upholding the search of a residence where the
suspect was observed traveling directly from that residence to
the location of drug transactions).

### b.    Proof of Residence

The defendant places heavy emphasis on the fact that police never confirmed that he actually resided at 127 Newbury Street. The government responds that such an argument is a red herring and that actual residence is irrelevant to whether there was a significant connection between Thompson's drug dealing and that address (which, in turn, would provide probable cause).  To an extent, both parties are correct.

As the government notes, there need not be probable cause to believe that Thompson resides at 127 Newbury Street for there to be probable cause to believe that he was storing drugs or otherwise using that address in connection with illegal activity. Nevertheless, much of the case law surrounding the nexus requirement is based on assumptions about the home being a "safe yet accessible place" where criminals (and drug traffickers in particular) are likely to conceal evidence of a crime.  See Feliz, 182 F.3d at 87-88.  Thus, to the extent that the government asserts that such assumptions can be made about 127 Newbury Street, Thompson's residence is relevant.

The facts presented in Morrissey's affidavit suggest that Thompson may have resided at 127 Newbury Street but are ultimately inconclusive.  This Court concludes nevertheless that the best approach is to discount the weight afforded to factors dependent on Thompson's residency by the degree of uncertainty

-12-

that persists concerning that residency.  Even discounting those
factors accordingly, this Court finds that there is ample
evidence in the affidavit to support the magistrate's finding of
probable cause.

Probable cause does not require that it be more likely true
than not true that evidence of a crime be found in a particular
location.  See United States v. Melvin, 596 F.2d 492, 495 (1st
Cir. 1979).  It is a less stringent standard than preponderance
of the evidence that applies, i.e. more akin to "reasonable
cause."  Id.  Here, one reasonable inference that could be drawn
from the facts presented in the affidavit, and the one drawn by
the reviewing magistrate, was that Thompson was using 127 Newbury
Street to store drugs.  The magistrate's determination of
probable cause is entitled to great deference.  See Gates, 462
U.S. at 236.  If courts are to pay anything more than lip service
to that concept of deference, then in cases such as this one the
magistrate's initial determination must tip the scales in favor
of upholding the warrant.

Consequently, this Court concludes that the warrant to
search 127 Newbury Street, Brockton, Massachusetts was supported
by probable cause and the defendant's motion to suppress will be
denied.

### 2.   The "Good Faith" Exception

Even were this Court to conclude that probable cause was

lacking, the search in this case surely falls well within the
parameters of the so-called "good faith" exception to the
exclusionary rule.  <u>See</u> <u>United States</u> v. <u>Leon</u>, 468 U.S. 897, 922
(1984) (holding that objectively reasonable reliance on a
subsequently invalidated search warrant does not justify
exclusion of evidence obtained pursuant to that warrant).  The
warrant in this case was not "so lacking in indicia of probable
cause as to render official belief in its existence entirely
unreasonable."  <u>See</u> <u>id.</u> at 923 (quoting <u>Brown</u> v. <u>Illinois</u>, 422
U.S. 590, 610-11 (1975) (Powell, J., concurring in part)).

Although the defendant relies heavily on <u>United States</u> v.
<u>Fuccillo</u>, 808 F.2d 173 (1st Cir. 1987), this Court agrees with
the government that that case is inapposite.  In <u>Fuccillo</u>, the
First Circuit concluded that the good faith exception could not
save a warrant that was defective in failing to differentiate
between legitimate merchandise and suspected stolen goods that
were to be seized.  <u>Id.</u> at 177-78.  In that case, the court
emphasized that the searching officers did not act in good faith
in executing the warrant and were reckless in preparing the
affidavit by not including information that was "known or easily
accessible to them."  <u>Id.</u>

Here, by contrast, there is no evidence that officers acted
in bad faith.  Nor was the warrant application recklessly
prepared merely because officers did not obtain further proof of

-14-

Thompson's residency or that he was storing drugs at 127 Newbury Street.  Further proof that drugs might be found at the subject address was neither known nor easily accessible.  <u>Cf.</u> <u>id.</u> Obtaining such information would have required more time and investigation, consuming limited police resources.  It might also have required permitting a suspected drug trafficker to continue his business while further evidence was sought.

Morrissey's affidavit was detailed and based on several days of surveillance. In such circumstances police officers' good faith reliance on the magistrate's finding of probable cause is exactly what the good faith exception permits.


**ORDER**

In accordance with the foregoing, the defendant's motion to suppress (Docket No. 24) is **DENIED**.


**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated June 3, 2009